**EXHIBIT B**

Page 1

Volume:    I

Pages:    1-137

ORIGINAL        Exhibits: Two

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

ROBERT SAWYER,            )
        Plaintiff,        )
        vs                ) Civil No.
                          )  04-11945-JLT
SPRINGFIELD TERMINAL      )
RAILWAY COMPANY and       )
BOSTON & MAINE            )
CORPORATION,              )
        Defendants.       )

        DEPOSITION of ROBERT J. SAWYER, a
witness called on behalf of the Defendants
pursuant to the applicable provisions of the
Massachusetts' Rules of Civil Procedure,
before Catherine L. Zelinski, a Certified
Shorthand Reporter and Notary Public in and
for the Commonwealth of Massachusetts at the
Law Offices of O'Brien and von Rosenvinge,
PC, 27 Mica Lane, Wellesley, Massachusetts,
on Thursday, March 31, 2005, commencing at
10:00 a.m.

        G & M COURT REPORTERS & ASSOCIATES

        (617) 338-0030

```
 1         knowledge when I ask a series of questions
 2         based on that.
 3              Is that all right?
 4    A.   I believe I understand, yes.
 5    Q.   Okay.  If you're not sure about something,
 6         tell me that you're not sure and then I'll
 7         ask whether or not I'm interested in your
 8         best estimate.
 9    A.   Yes.
10    Q.   All right?  Okay.
11              Sir, what was the date of incident
12         involved in this lawsuit?
13    A.   October 23rd.
14    Q.   Of what year?
15    A.   2003.
16    Q.   On that date you were employed in the same
17         position that you are today by the same
18         railroad?
19    A.   Yes.
20    Q.   And you were on a locomotive that day?
21    A.   Yes.
22    Q.   Do you remember the locomotive number?
23    A.   515 I believe.
24    Q.   Had that piece of equipment, that locomotive,
```

1       was the date of this incident the first

2       occasion you've ever worked on that piece of

3       equipment?

4    A.  I cannot say for sure.

5    Q.  When you say you can't say for sure, do you

6       believe you may have worked on it before that

7       date?

8    A.  Possibly, yes.

9    Q.  All right.

10          Do you have any idea without a sheer

11      guess, do you have a best estimate as to how

12      many times you may have worked on that piece

13      of equipment before the date of this

14      incident?

15   A.  No, I do not.

16   Q.  Would it be fair to say that it was at least

17      more than once?

18          MR. RILEY:  Well, objection to the

19      form.

20          Go ahead and answer.

21   A.  I would have to guess, yes.

22   Q.  When you say guess, are you giving me your

23      best estimate that you probably worked on it

24      more than on at least one occasion prior to

| 1  |    | the date of this incident?                       |
|----|----|--------------------------------------------------|
| 2  | A. | Yes, at least one occasion.                      |
| 3  | Q. | Are you able to tell me if you worked on it      |
| 4  |    | at least two occasions before the date of        |
| 5  |    | this incident?                                   |
| 6  | A. | No.                                              |
| 7  | Q. | With respect to the one occasion you may have    |
| 8  |    | worked on it before the date of the incident     |
| 9  |    | do you recall when in relation to the            |
| 10 |    | incident that occasion would have been?          |
| 11 | A. | No.                                              |
| 12 | Q. | Do you know if it would have been within a       |
| 13 |    | year prior to the date of your incident in       |
| 14 |    | this case?                                        |
| 15 | A. | I would have to guess yes.                       |
| 16 | Q. | Your best estimate would be --                   |
| 17 | A. | Yes, my best estimate.                           |
| 18 | Q. | Can you narrow it down any more than a year?     |
| 19 | A. | No, I wouldn't be able to.                       |
| 20 | Q. | Okay.                                            |
| 21 |    | On the date of this incident you were            |
| 22 |    | working with a person named Gary Willis?         |
| 23 | A. | Yes.                                             |
| 24 | Q. | And you on this piece of equipment your          |

1       position was as a conductor?

2    A.  Yes.

3    Q.  And Mr. Willis was the engineer?

4    A.  Yes.

5    Q.  Now, at the time of the incident, you had

6        been working for approximately five and a

7        half hours?

8    A.  Yes.

9    Q.  And where was the locomotive -- where was the

10       location, where was it at the time of your

11       incident, what town or yard?

12   A.  It was in Somerville.

13   Q.  Now, you were intending to have the equipment

14       moved so that it could be put away for the

15       day?

16   A.  Yes.

17   Q.  When was the last time you spoke to

18       Mr. Willis for any reason?

19   A.  Just prior to leaving the cab.

20   Q.  Up to this moment in time, as of today, when

21       was the last time you spoke to Mr. Willis for

22       any reason?

23   A.  Yesterday.

24   Q.  Did you contact him or did he call you?

| 1 | Q. | -- before this incident? |
|---|---|---|
| 2 | A. | Yes. |
| 3 | Q. | You had. All right. |
| 4 | | Do you take lunch the same time every |
| 5 | | day? |
| 6 | A. | Yes. |
| 7 | Q. | What time was that? |
| 8 | A. | Eleven-thirty, twelve o'clock. |
| 9 | Q. | With respect to boarding the engine when you |
| 10 | | started work that day, where was the engine, |
| 11 | | sir, was it in the same yard? |
| 12 | A. | Yes. |
| 13 | Q. | And when you boarded the engine, were you the |
| 14 | | first one on the equipment or was Mr. Willis |
| 15 | | on there before you that day? |
| 16 | A. | Mr. Willis was. |
| 17 | Q. | Do you have any idea how much longer he had |
| 18 | | been on it before you that day? |
| 19 | A. | Approximately a half an hour. |
| 20 | Q. | When you boarded the equipment, how did you |
| 21 | | do that? What portion of the equipment did |
| 22 | | you climb up on and how did you get up on to |
| 23 | | the equipment that morning? I mean, the |
| 24 | | locomotive. The first time you went on the |

1      locomotive that morning.

2   A. To the best of my recollection, I would have

3      gone through the front door.

4   Q. When you say the front door, you mean the

5      door on that -- that faces the nose?

6   A. Yes.

7   Q. That was the door that was involved in your

8      incident?

9   A. Yes.

10  Q. When you utilized that door to gain access

11     into the cab, when you first started working

12     that morning, you were able to do that

13     without incident?

14  A. Yes.

15  Q. Did you pass through that door again that day

16     before your incident?

17  A. To the best of -- yes, I would have.

18  Q. How many times?

19  A. And I wouldn't know that.

20  Q. Okay.

21          During the course of your employment

22     that day, your job -- what was it the

23     locomotive was doing?  Was it a switcher?

24  A. Yes, it was.

1  Q.  And can we agree that one of the functions of

2      a switcher is to move cars within a yard and

3      to set up other trains for transportation out

4      of the yard?

5  A.  Yes.

6  Q.  And you, as the conductor, are in charge of

7      that switcher train?

8  A.  Yes.

9  Q.  And you communicate with the engineer by way

10     of radio and hand signal, if you're in his

11     vision, as to how he should move the

12     locomotive in relation to the freight cars

13     you're intending to set up trains with?

14 A.  Yes.

15 Q.  And you had a radio that day?

16 A.  Yes.

17 Q.  Would you agree that in your position as you

18     -- as we've just talked about, that your job

19     duties and responsibilities would require and

20     necessitate you getting on and off that

21     locomotive and going in and out of that cab

22     of that locomotive to such a -- to such a

23     number that you really couldn't keep track on

24     any given day how many times you were going

1      back and forth?

2  A.  Yes.

3  Q.  On that day, can we agree that your job would

4      have required you to go back and forth

5      through that door at least 12 times?

6  A.  I suppose you could put just about any

7      number on it that you would like.

8  Q.  You wouldn't limit it to 12 and it wouldn't

9      surprise you if it was 60 times.  It could be

10     as few or as many, there's just no way of

11     knowing?

12 A.  Well, maybe 60 is a little excessive.

13 Q.  Okay.  How about 50?

14         You wouldn't rule it out?

15 A.  I couldn't possibly.  I suppose I couldn't

16     possibly rule it out.

17 Q.  Okay.

18         Now, in a yard there are -- in order

19     to perform this function that you've told us

20     your job requires, there's -- you need to

21     throw switches so that the locomotive or that

22     the switcher locomotive can get from one

23     track to the other.  Do you agree with that?

24 A.  Yes.

1       signal with respect to how he should move the

2       locomotive?

3   A.  Yes.  But it was always in -- along with the

4       radio transmission.

5   Q.  Okay.  So then --

6   A.  For the most part.

7   Q.  So then can we say that whenever you gave

8       Mr. Willis a signal that day, even if you and

9       he could see each other visually, you would

10      speak on the radio?

11  A.  Yes.

12  Q.  Now, at some point the locomotive comes to a

13      location where you intend to get off and

14      throw a switch before your accident happened,

15      right?  Let me ask you this.  I didn't like

16      that either.  Strike the question.

17          At approximately 1:15 you intend to

18      leave the cab, go through the door and go

19      down and throw a switch in the Somerville

20      yard, right?

21  A.  Yes.

22  Q.  Before leaving the cab, do you have any

23      conversation with Mr. Willis?

24  A.  With what respect?

1   Q.   With anything.

2   A.   Yes.

3   Q.   All right.  I'm going to interrupt you.

4   A.   Okay.

5   Q.   Do you remember, as you sit here,

6        specifically what he said and what you said

7        before you left the cab to go through the

8        switch?

9   A.   No.

10  Q.   All right.

11            Was it your custom and practice when

12       working with him to have a conversation with

13       him before you'd leave the cab about what you

14       intended to do?

15  A.   Yes.

16  Q.   Do you have any reason to think that you

17       didn't have that type of a conversation with

18       him on this occasion before you went through

19       the door and were injured?

20  A.   No, I don't.

21  Q.   So as you sit here, you don't recall

22       specifically what you said but it's fair to

23       say the substance of your discussions with

24       Mr. Willis before you left the cab that day

1       involved your going down to throw the switch?

2    A.  Yes.

3    Q.  If you hadn't been injured, would it be fair

4       to say you go down, throw the switch,

5       communicate with Mr. Willis on the engine,

6       he'd move the engine in accordance with your

7       instructions and then you'd throw the switch

8       back and board the equipment again?

9    A.  Yes.

10   Q.  With regards to you leaving the cab to go in

11      and throw the switch, you walk through the

12      door and essentially the next thing you knew

13      you had been injured?

14   A.  Yes.

15   Q.  To your knowledge, did Mr. Willis see that

16      happen?

17   A.  No.

18           MR. RILEY:  When you say see, see

19      how he got hurt is that what you're referring

20      to?

21           MR. O'BRIEN:  Yes.

22   Q.  You understood that, right?

23   A.  Yes, I did.

24   Q.  And that's because of his position in the cab

Page 43

```
 1        that Mr. Willis left the cab to get to you
 2        right after your accident by using the same
 3        door that you had been injured at?
 4    A.  Yes.
 5    Q.  Are there any or doors on that switch or
 6        locomotive to access the cab?
 7    A.  Yes.
 8    Q.  Are there more than, are there two others?
 9    A.  Yes, there is.
10    Q.  One on each side?
11    A.  Yes.
12    Q.  So there's a total of three doors to gain
13        entry and to gain access to and from that
14        cab?
15    A.  Yes.
16    Q.  There wasn't anything preventing you from
17        using either of the side doors in order to
18        get to the switch that you intended to throw,
19        was there?
20    A.  No.
21    Q.  Have you ever seen the ambulance report --
22        strike it out.
23            Do you know whether or not an
24        ambulance report was ever prepared with
```

1       what happened to you with your wife and

2       Mr. Sarno?

3   A.  Yes.

4   Q.  Can you tell me everything you told them on

5       that occasion?

6   A.  Generally.  I can only tell you generally.

7   Q.  So you don't recall your specific

8       conversation?

9   A.  I can't recall my specific conversation.

10   Q.  Then please tell us generally the substance

11       of your conversation with your wife and

12       Mr. Sarno.

13   A.  That the tip of my finger was amputated and

14       I don't recall how it actually happened.

15   Q.  And you've now told me the substance of --

16       strike it out.

17           You've now told me all of the

18       substance of your conversation that you've

19       had with Mr. Sarno and your wife during that

20       30-minute time period after he brought you

21       home?

22   A.  Yes.

23   Q.  You don't have any notes anywhere with

24       respect to that conversation, do you?

```
 1        reading recollected with -- what you read was

 2        what you remembered occurring at the hearing?

 3             MR. RILEY:  Objection to the form of

 4        the question.

 5             You can answer.

 6   A.   Yes.

 7   Q.   Now, at that hearing you had an opportunity

 8        to speak?

 9   A.   Yes.

10   Q.   And you or your representative, the union

11        representative had an opportunity to question

12        the witnesses that were called?

13   A.   Yes.

14   Q.   And in fact, that all happened; is that

15        right?

16   A.   Yes.

17   Q.   Now, when you testified at that hearing,

18        everything you testified to was, as far as

19        you were concerned, truthful, wasn't it?

20   A.   Yes.

21   Q.   And everything that you testified to at that

22        hearing was accurate?

23   A.   Yes.

24   Q.   And everything you testified to at that
```

1    hearing was complete?

2    A.  Yes.

3    Q.  All right.

4        Now, as a result of that hearing, you

5        received discipline from the railroad?

6    A.  Yes.

7    Q.  And you appealed that disciplinary decision?

8    A.  Yes.

9    Q.  And that appeal was upheld, is that your

10       understanding?  I don't like that either.

11       You don't understand that question, do you?

12   A.  No, I don't.

13   Q.  Okay.

14       As a result of the hearing, discipline

15       -- you received discipline and you appealed

16       that decision with respect to discipline,

17       right?

18   A.  Yes.

19   Q.  Okay.

20       What's your understanding as to the

21       results of that appeal?

22   A.  What are my understandings?

23   Q.  Yes, that's my question.

24   A.  That the appeal was won.  I won the appeal.

Page 113

1  A.  Yes.

2  Q.  And you'll agree with me, won't you, that if

3      you made an observation of this door that you

4      deemed to be unsafe, that you shouldn't use

5      the door?

6  A.  Yes.

7  Q.  With respect to your using the door, or

8      you've already told us you used it a number

9      of times that day, with respect to performing

10     your job duties, there were other avenues you

11     could have utilized besides this door in

12     order to accomplish the job, right?

13 A.  Yes.

14 Q.  All right.

15         So with regards to any claim that the

16     door wasn't maintained in a safe condition,

17     as far as you were concerned on the date of

18     this incident, you had observed the door and

19     made a determination prior to your accident

20     that it was operating in a safe condition,

21     didn't you?

22         MR. RILEY:  Answer the question.

23         Objection to the form.

24         Answer the question.

1    A.   Yes.

2    Q.   Now, with respect to those observations that

3         you made, you utilized the door knowing and

4         being fully aware that there was no latching

5         device on the door, operable latching device

6         on the door, didn't you?

7    A.   Yes.

8    Q.   And with respect to the term operable

9         latching device, is that your term?

10   A.   Yes.

11   Q.   And by that, do you mean something other than

12        the door handle and the mechanism in the door

13        handle?

14   A.   Yes.

15   Q.   Now, insofar as that discipline in 2004 was

16        concerned where you protested using a

17        switcher in the 500 series, that was for the

18        reason that the door on that switcher was the

19        -- of the same type and nature of the door

20        involved in your lawsuit?

21   A.   Yes.

22   Q.   With respect to that protest, you made the

23        protest and then continued and performed your

24        job duties accordance with the way you were

1      supposed to?

2   A. Yes.

3   Q. And you utilized that door in the performance

4      of those duties, didn't you?

5   A. No.

6   Q. And since the date of this incident have you

7      worked on 500 series switch doing your job?

8   A. Yes.

9   Q. In addition to the incident in which you were

10     disciplined for delaying switchers for the

11     delaying of the switcher?

12  A. Yes.

13  Q. Now, part of your job duties and

14     responsibilities require you to report any

15     unsafe work condition that you encounter or

16     see, right?

17  A. Yes.

18  Q. Prior to the time of your accident, on the

19     date of your accident you did not report any

20     unsafe work conditions, did you?

21  A. Would you clarify that question, please?

22  Q. Well, let me see if I can ask it again.

23          With respect to the date of your

24     incident prior to you being injured, you had

1    not reported any unsafe work conditions to

2    any of your supervisors or dispatchers or

3    anyone at the railroad that day, had you?

4   A.   No.

5   Q.   Now, sir, if you could, please, in your

6    Answers to Interrogatories, could you read

7    question five and your answer to question

8    five, all of them to yourself and tell us

9    when you're done.

10  A.   (Witness complies.)

11           Yes.

12  Q.   All right.

13           Sir, you've had an opportunity to look

14    at that?

15  A.   Yes.

16  Q.   You'll see in answer No. 5 it says:

17    Plaintiff reserves the right to supplement

18    this response.

19           Do you have any supplementation to

20    that?

21  A.   No.

22  Q.   So this answer 5A is full and complete as it

23    appears?

24  A.   Yes.

1    door could close so quickly, you'll agree

2    with me that you never reported the door

3    closing in a quick fashion prior to you being

4    injured, did you?

5  A.  No.

6  Q.  And that if the door closed in a quick

7    fashion prior to you being injured, you were

8    expected to report that condition, weren't

9    you?

10  A.  Yes.

11  Q.  And you never did that, did you?

12  A.  No.

13  Q.  And then with the reference to forcefully,

14    the door could close forcefully due to a

15    latching device, that's --

16        MR. RILEY:  Due to lack of.  I

17    apologize.

18        MR. O'BRIEN:  I misread.

19  Q.  And with respect to the door could close

20    forcefully due to a latching device, that's

21    based on -- well, let me ask this.  Strike it

22    out.

23        You never reported the door closing

24    forcefully prior to your incident, did you?

|    |    |                                                |
|----|----|------------------------------------------------|
| 1  | A. | No.                                            |
| 2  | Q. | And that condition was something you would be  |
| 3  |    | expected to report in the event you           |
| 4  |    | considered it to be unsafe?                    |
| 5  | A. | Yes.                                           |
| 6  | Q. | Now, is it your testimony that other           |
| 7  |    | locomotives besides the 500 series of the      |
| 8  |    | type and nature involved in this lawsuit have  |
| 9  |    | latching devices on the locomotive doors?      |
| 10 | A. | No, they don't.                                |
| 11 | Q. | So then am I correct in understanding that as  |
| 12 |    | far as you're concerned, all locomotives,      |
| 13 |    | switching the locomotives of the type and      |
| 14 |    | nature involved in this lawsuit, do not have   |
| 15 |    | latching devices on any of the cab doors?      |
| 16 | A. | Yes.                                           |
| 17 | Q. | And that, that has been the situation since    |
| 18 |    | you joined the railroad in 1971 that the cab   |
| 19 |    | doors do not have latching devices on them     |
| 20 |    | and switchers?                                 |
| 21 | A. | No.                                            |
| 22 | Q. | No what? I don't understand your answer.       |
| 23 | A. | Ask the question again.                        |
| 24 | Q. | Your answer claims that because there wasn't   |