IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

ROBERT SAWYER                        :
                                     :
        Plaintiff,                   :     CIVIL ACTION
                                     :
    vs.                              :     NO.  04-11945-JLT
                                     :
SPRINGFIELD TERMINAL                 :
RAILWAY COMPANY and                  :
BOSTON & MAINE CORPORATION           :
                                     :
        Defendants.                  :

### AFFIDAVIT OF ROBERT SAWYER

I, Robert Sawyer, on oath depose and say:

1.    I am a conductor for Springfield Terminal Railway and have worked for the railroad since 1971.

2.    While working for Springfield Terminal Railway, I have exited the nose or exterior cab door of Locomotive MEC-515 or similar locomotives thousands of times.

3.    I cannot recall ever closing the nose or exterior cab door of any locomotive, including locomotive MEC-515, on my hand.

4.    Nor can I recall ever closing the nose or exterior cab door of locomotive MEC-515 or a similar locomotive when my hand was positioned in such a way as to be struck by the door when it closed.

Signed under the pains of perjury this     day of 08 / 24 , 2005.


_____
Robert Sawyer                    03/24/05

Arman Shirikyan
Notary Public
My Commission Expires June 15, 2012
Commonwealth of Massachusetts

A. SHIRIKYAN
03/24/05



**Lewis N. Catone**
**Railroad Transportation Consultant**
**58 Old Bedford Road**
**Goldens, NY 10526**
**(914) 301-5070**

---

May 2, 2005

Barish Law Offices, P.C.
Counsellors at Law and Proctors in Admiralty
Three Parkway, Suite 1320
1601 Cherry Street
Philadelphia, PA 19102

Re: Sawyer v. Springfield Terminal Railway

Introduction

At approximately 1:30PM. On Thursday, October 23, 2003, Mr. Robert J. Sawyer, Conductor, assigned to Springfield Terminal Railway, Freight Switcher, No. BO-1, suffered injury while making an exit from MEC-Locomotive 515, (Light) after stopping on the track designated as; 3rd Iron Extension, in the Somerville Yard, Boston, Massachusetts.

I have been requested by the Barish Law Offices, P.C. to provide the following services:

1. To review information and documents produced through discovery, and:
   - analyze the actions of the crew of Switcher BO-1, during the time in which the injury occurred.

2. To render my professional opinions that I have reached to date, based upon my findings, regarding:
   - compliance with applicable rules, agreements or standard practices.
   - casual factor(s) that resulted in this occurrence.

-1-

**Material Reviewed**
1. SPT Accident/Incident Report GTSF 100 (marked exhibit "a").

2. Mechanical Department Memorandum prepared by M.J. Walsh-GM of Locomotives, dated October 24th 2003.

3. Hearing Transcript of formal investigation held on November 19, 2003, to develop the facts and determine responsibility, if any, in connection with Mr. Sawyer's (alleged) failure to properly perform his duties at the time he received injury, while employed as Conductor on assignment BO-1, at approximately 1320 hours (1:20PM) while in the process of leaving the cab of Locomotive MEC 515 to detrain and align switch for final movement to complete assignment, on October 23, 2003.

4. Included in this transcript are the following document copies;
    (a) A Letter to Mr. Sawyer advising him of the charge and date of hearing to be scheduled for November 19, 2003, having been originally scheduled for November 7, 2003 but was postponed at the request of UTU Local Chairman, Chartrand. Includes pertinent data.

    (b) Nine photographs of Locomotive MEC 515, taken by the Carriers Police Department.

    (c) Two sheets of printed B&M form that show a record of discipline but no employment information.

    (d) Notice of discipline assessed Mr. Sawyer, charging him with failure to comply with Safety Rule 79, of the Springfield Terminal Railway that specifies:

    "Care must be exercised in opening and closing locomotive, and car doors to avoid injury to fingers being caught against door facings and latches. Handles provided for that purpose must be used. Do not place fingers or hands on edge of door jamb for any reason."

    Fourteen (14) Days Suspension (effective December 1, 2003, through and including December 14, 2003, and review of Springfield Terminal Railway Company Safety Rules.

-2-

Material Reviewed Continued

5. Cataldo Ambulance Services Report of October 23, 2003

6. Deposition of Robert J. Sawyer, dated March 31, 2005.

7. Public Law Board No. 4623, Case no. 130, findings for the appeal of
   Conductor, Robert J. Sawyer.

## Injury Event

Robert J. Sawyer, reported for duty on Thursday, October 23, at
approximately 8:00 A.M. to the Somerville, MA facility (3rd Avenue Trailer)
to cover his regular assignment as Conductor on Job No. BO-1, a local
switcher. The crew of BO-1 consists of a Conductor and an Engineer.
They were assigned Locomotive MEC - 515, a modified road unit.

During the course of his assignment, together with Locomotive Engineer,
Gary Willis, they proceeded with their consist and switched local industries
within the Boston environs. This was their normal work and had
been performed on a regular basis.

After completing their regular work they returned to the Somerville yard to
put their train away and tie up. They proceeded to leave their empty cars on
the designated "3rd iron extension" track and moved to put their locomotive,
on the regularly assigned "MS Walker" track.

The lite Engine moved to the switch leading into the "MS Walker" track and
stopped short of the switch. Mr. Sawyer picked up his kit bag and entered
the "nose" portion of the locomotive to detrain and align the switch. He
would not have had to return to the cab of the locomotive as their tour was
now complete, and once the engine was secured they would go off duty.

Mr.Sawyer walked approximately six feet, after stepping down into the nose
portion of the cab and walked forward to the exterior (nose) door. He opened
the door in the usual manner (outward) with no resistance. Holding his bag in
his left hand, he was in the process of stepping out to the deck when the door
with some unknown force suddenly slammed back, causing injury to his
Right Hand, putting him in a state of complete traumatic surprise.

-3-

## Injury Event Continued

On impact he instinctively held up his injured hand. On observing heavy bleeding, he yelled to the Engineer that he needed an ambulance. Engineer Willis, from his seat, observed Mr. Sawyer, on the deck with his bloody hand raised and immediatly notified the AMTRAK Dispatcher, who summoned an ambulance to the scene. The ambulance arrived and upon examination took Mr. Sawyer, to the Massachussetts General Hospital, Emergency Room where he received medical treatment.

## Opinion

Based upon my interview with the Plantiff and review of the documents available, and articles listed herein. I have arrived at the following opinions and conclusions, relative to the Plantiff's accident that occurred at approximately 1:30 P.M., on the afternoon of October 23, 2003.

In all of the material furnished by the Springfield Terminal Railway, I feel that no serious investigation was made to determine the cause of the accident, or to effect a remedy.

The Federal Railroad Administration (FRA) regulations at Title 49, part 225 requires the railroad to use the current FRA Guide for Preparing Accident/Incident Reports. In part, this requires the railroad to report all accidents/incidents resulting in death or injury. These reports shall state the nature and causes thereof and the circumstances therewith.

The reports allow the FRA to gather data and statistics, and to further issue recommendations and guidelines to improve working conditions that conform to OSHA requirements. I see no intelligent record of compliance with these instructions, in that the material furnished does not in my opinion indicate a probable cause for this accident/injury other than a Safety Rule (79) violation that was fully complied with by the Plantiff.

The Plantiff, Mr. Sawyer was disciplined as a result of a formal investigation that did not develop any probable cause by design, but a weak attempt to blame Employee negligence for the accident.

-4-

## Opinion Continued

Ultimately, The Public Law Board (PLB) received an appeal from the United Transportation Union for removal of the discipline assessed Mr. Sawyer. This appeal was made in accordance with the provisions of the Railway Labor Act.

The Board (PLB) reviewed the whole record and evidence submitted. They ruled in the claimant's favor, in that the Carrier (Springfield Terminal Railway) failed to convince the Board, that the Claimant violated Safety Rule 79, while leaving the Engine (MEC 515) on October 23, 2003. The Award states that
"the discipline assessed was unjustified and that the discipline must be removed from the claimants record, and he must be made whole for all lost wages".

Of significance is the Public Law Boards statement that reads in part
"THERE IS NOT A SCINTILLA OF EVIDENCE THE CLAIMANT DID ANYTHING TO CAUSE THE DOOR TO CLOSE ON HIS HAND. HE USED THE HANDLE ON THE DOOR TO OPEN IT, AS RULE 79 REQUIRES. BECAUSE THERE WAS NO DEVICE TO SECURE THE DOOR, IT INEXPLICABLY CLOSED CAUSING A SERIOUS INJURY TO THE CLAIMANTS FINGER. SINCE THE ACCIDENT HAPPENED SO SUDDENLY THERE WAS NOTHING THE CLAIMANT COULD HAVE DONE TO PREVENT IT IN OUR VIEW".

The Public Law Board substantiates and strengthen's my opinion, being more explicit in their review of the hearing transcript materials. It clearly shows that the carrier (Springfield Terminal Railway) must be held responsible for the safety of their employee's in the performance of their duties.

The GP-40-2 Locomotives were built with access to the front and rear deck from the cab door(s) of the locomotive, leading to a walkway to the front of the locomotive from the Trainmans side, or to the rear from the Engineers side as shown in photo (d) & (e) attached. This is the type (GP-40) used on most major railroads in the United States.

The Locomotive involved in the accident, MEC-515, differs from the
GP-40-2s that I researched on the major railroad systems in the United States.
Research indicates that MEC-515 as well as other GP-40-2s were modified in
Canada, with a full cab (referred to as a Safety Cab), by the Canadian
National Railroad; then through whatever channels, were purchased for use
on the Guilford Railroad System. Access to the front deck in these modified
locomotives is through a door in the front (nose) of the locomotive as pictured
in photos(a), (b), (c) attached. This door swings outward with no locking
catch or door check.

The Road Foreman of Engines testified during the formal hearing that
the door involved on MEC-515 does not have any safety feature to prevent
it from slamming shut and a strong wind could possibly close the door.
The transcript makes no reference to wind conditions on the day of the
accident, other than a light drizzle of rain and cloudy with good visability
and a temperature of 38 degrees.

It must be noted that the investigation of the injury was conducted by an
Senior Officer of the Railway and its Police Department. The Police
Department report was not included in the documents furnished by the
Carrier.

My research into the hourly historical weather conditions in the Boston area
on Thursday, October 23, 2003, indicate that the wind velocity was variable
to the extent that it was the contributing factor that caused the accident. The
Wind Speed was recorded as 14 mph, Maximum Speed 21 mph, and the
Maximum Gust Speed at 28 mph. The Wind changed direction often during
the period with significant gusts. The report is enclosed, as exhibit AA.

The photographs and weather reports that I reviewed in addition to those
furnished by the defendant are:

1. AA, The Historical Weather report for Boston, MA on October 23, 2003,
   (4 pages).
2. (a), Photo of MEC 515, the Canadian National Railway, modified
   Locomotive involved in the accident.
3. (b), (c) Photos of the nose door on sister locomotives.
4. (d), (e) Photos of the cab door and walkway to the front deck on GP-40s,
   as originally received from the manufacturer, EMD.

Summary/Conclusion

Based on the material furnished and that gathered from research, I have
arrived at the following opinions and conclusions relative to the Plantiff's
accident. The accident occurred in the early afternoon at approximately
1:30PM on October 23rd 2003, while he was in the process of detraining
from Locomotive MEC 515, to align the route for movement into the "MS
Walker" track, to tie up, completing his assignment. The Locomotive had
come to a full stop before the Plantiff moved to the head-end (nose)of the
locomotive.

After opening the exterior door (outward) and in  the process of stepping out
of the open doorway, with his kit bag in his left hand to the open platform.
The heavy steel door with great force suddenly slammed back and caught his
Right Hand, causing injury.

It is my opinion that the open door was slammed back by a sudden gust of
heavy wind. The door had no resistance and the plantiff was in motion with
the door open. The door made of heavy steel had no catch to secure it in the
open position, nor did it have a door check to control the doors movement
against  any undesired movement. The record shows that the wind changed
direction  frequently and gusted rapidly causing  changes in velocity. The
deck itself was wet as the result of light rain.

The Locomotive (MEC 515) was modified in Canada and in operation on the
Canadian National Railway System before being purchased by the Guilford
Railway System. While I am not able to determine if the modification was
made in accordance with US-FRA Safety Standards. I believe that the door
should have been equipped with a door check or latch as a safety measure to
comply with  US, CFR, Title 49 and that Guilford had an obligation to
provide this feature. It is the custom and common practice for an exterior
door of this type to be equipped with a latch to secure it in the open position,
and/or a commercial safety hydraulic door closer to prevent any undesired
action, such as the one that caused injury to the Plantiff.

It is also my opinion that Springfield Terminal Railways investigation failed to report the probable cause and was deficient in both its investigation and its subsequent reporting to the FRA. It did not allow FRA to properly evaluate the circumstances and effect a suggested remedy.

Therefore I conclude that the Defendant Springfield Terminal Railway, did not provide a safe working environment in that the "Nose" door of Locomotive MEC 515, lacked any safety appurtanances to prevent any undesired movement.

Code of Federal Regulations, Title 49, Part 229, "Locomotive Safety Standards & Locomotive Inspections" reads:

Part 229.119 **Cabs Floors, and passageways**
        (a) Cab seats shall be securely mounted and braced.
            **Cab doors shall be equipped with a secure and operable latching device.**

I reserve the right to amend this report should additional information become available.

Respectfully submitted,

Lewis N. Catone

Encl.

-8-



# History for Boston, Massachusetts
## on Thursday, October 23, 2003

# October 23, 2003

### Daily Summary

| | Actual | Average | Record |
|---|---|---|---|
| **Temperature** | | | |
| Mean Temperature | - | 52 °F / 11 °C | |
| Max Temperature | 41 °F / 5 °C | 59 °F / 15 °C | 84 °F / 28 °C (1947) |
| Min Temperature | 36 °F / 2 °C | 44 °F / 6 °C | 29 °F / -1 °C (1883) |
| **Degree Days** | | | |
| Heating Degree Days | 26 | 13 | |
| Month to date heating degree days | 269 | 228 | |
| Since 1 July heating degree days | 303 | 324 | |
| Cooling Degree Days | 0 | 0 | |
| Month to date cooling degree days | 0 | 7 | |
| Year to date cooling degree days | 755 | 776 | |
| **Moisture** | | | |
| Dew Point | 35 °F / 1 °C | | |
| Average Humidity | 85 | | |
| Maximum Humidity | 100 | | |
| Minimum Humidity | 70 | | |
| **Precipitation** | | | |
| Precipitation | 0.01 in / 0.03 cm | 0.12 in / 0.30 cm | 2.33 in / 5.92 cm (1956) |
| Month to date precipitation | 3.69 | 2.76 | |
| Year to date precipitation | 34.27 | 33.79 | |
| **Snow** | | | |
| Snow | T in / T cm | 0.00 in / 0.00 cm | T in / T cm (2003) |
| Month to date snowfall | T | 0.0 | |
| Since 1 July snowfall | T | 0.0 | |
| Since 1 September snowfall | T | 0.0 | |
| Snow Depth | 0.00 in / 0.00 cm | | |
| **Wind** | | | |
| Wind Speed | 14 mph / 23 km/h () | | |
| Max Wind Speed | 21 mph / 34 km/h | | |
| Max Gust Speed | 28 mph / 45 km/h | | |
| **Visibility** | 10 miles / 15 kilometers | | |
| **Events** | Rain , Snow | | |

**Key:** T is trace of precipitation, MM is missing value
**Source:** NWS Daily Summary



## Show full METARS (help) - Comma Delimited File

| Time (EDT) | Temperature | Dew Point | Humidity | Pressure | Visibility | Wind Direction | Wind Speed | Gust Speed | Precipitation | Events | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:54 AM | 39.9 °F / 4.4 °C | 35.1 °F / 1.7 °C | 83% | 29.49 in / 998.6 hPa | 10.0 miles / 16.1 kilometers | NW | 12.7 mph / 20.4 km/h | - | N/A | | Overcast |
| 1:19 AM | 39.2 °F / 4.0 °C | 35.6 °F / 2.0 °C | 87% | 29.48 in / 998.2 hPa | 10.0 miles / 16.1 kilometers | NW | 13.8 mph / 22.2 km/h | - | N/A | | Overcast |
| 1:54 AM | 37.9 °F / 3.3 °C | 35.1 °F / 1.7 °C | 89% | 29.48 in / 998.3 hPa | 10.0 miles / 16.1 kilometers | NW | 11.5 mph / 18.5 km/h | - | N/A | | Overcast |
| 2:54 AM | 37.0 °F / 2.8 °C | 34.0 °F / 1.1 °C | 89% | 29.46 in / 997.5 hPa | 10.0 miles / 16.1 kilometers | NW | 15.0 mph / 24.1 km/h | - | N/A | | Overcast |
| 3:54 AM | 37.0 °F / 2.8 °C | 34.0 °F / 1.1 °C | 89% | 29.45 in / 997.1 hPa | 10.0 miles / 16.1 kilometers | NW | 12.7 mph / 20.4 km/h | - | N/A | | Overcast |
| 4:54 AM | 37.0 °F / 2.8 °C | 34.0 °F / 1.1 °C | 89% | 29.46 in / 997.4 hPa | 10.0 miles / 16.1 kilometers | NW | 12.7 mph / 20.4 km/h | - | N/A | | Overcast |
| 5:54 AM | 37.0 °F / 2.8 °C | 34.0 °F / 1.1 °C | 89% | 29.45 in / 997.2 hPa | 10.0 miles / 16.1 kilometers | WNW | 15.0 mph / 24.1 km/h | - | 0.00 in / 0.0 cm | Rain , Snow | Light Rain |
| 6:19 AM | 37.4 °F / 3.0 °C | 35.6 °F / 2.0 °C | 93% | 29.45 in / 997.2 hPa | 10.0 miles / 16.1 kilometers | WNW | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | Rain , Snow | Light Rain |
| 6:35 AM | 35.6 °F / 2.0 °C | 35.6 °F / 2.0 °C | 100% | 29.45 in / 997.2 hPa | 8.0 miles / 12.9 kilometers | WNW | 15.0 mph / 24.1 km/h | - | 0.00 in / 0.0 cm | Rain , Snow | Light Rain |
| 6:44 AM | 35.6 °F / 2.0 °C | 35.6 °F / 2.0 °C | 100% | 29.45 in / 997.2 hPa | 9.0 miles / 14.5 kilometers | WNW | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | Snow | Light Snow |
| 6:54 AM | 36.0 °F / 2.2 °C | 35.1 °F / 1.7 °C | 97% | 29.45 in / 997.2 hPa | 8.0 miles / 12.9 kilometers | WNW | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | Snow | Light Snow |
| 7:54 AM | 36.0 °F / 2.2 °C | 34.0 °F / 1.1 °C | 93% | 29.45 in / 997.3 hPa | 10.0 miles / 16.1 kilometers | WNW | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | | Overcast |

| Time | Temp (°F / °C) | Dew Point (°F / °C) | Humidity | Pressure (in / hPa) | Visibility (miles / km) | Wind Dir | Wind Speed (mph / km/h) | Gust | Precip (in / cm) | Events | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AM | C | F / 2.0 °C | 100% | 997.2 hPa | 14.5 kilometers | NW | | | | Snow | Snow |
| 8:54 AM | 36.0 °F / 2.2 °C | 35.1 °F / 1.7 °C | 97% | 29.46 in / 997.6 hPa | 9.0 miles / 14.5 kilometers | NW | 12.7 mph / 20.4 km/h | | 0.00 in / 0.0 cm | Snow | Light Snow |
| 9:54 AM | 37.0 °F / 2.8 °C | 36.0 °F / 2.2 °C | 96% | 29.46 in / 997.6 hPa | 10.0 miles / 16.1 kilometers | NW | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | Rain, Snow | Light Rain |
| 10:01 AM | 37.4 °F / 3.0 °C | 35.6 °F / 2.0 °C | 93% | 29.46 in / 997.5 hPa | 10.0 miles / 16.1 kilometers | NW | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | Rain, Snow | Light Rain |
| 10:54 AM | 37.9 °F / 3.3 °C | 36.0 °F / 2.2 °C | 93% | 29.46 in / 997.6 hPa | 10.0 miles / 16.1 kilometers | NW | 16.1 mph / 25.9 km/h | - | 0.00 in / 0.0 cm | | Overcast |
| 11:54 AM | 37.9 °F / 3.3 °C | 35.1 °F / 1.7 °C | 89% | 29.47 in / 997.7 hPa | 10.0 miles / 16.1 kilometers | NW | 13.8 mph / 22.2 km/h | - | 0.00 in / 0.0 cm | Rain | Light Rain |
| 12:27 PM | 37.4 °F / 3.0 °C | 35.6 °F / 2.0 °C | 93% | 29.47 in / 997.9 hPa | 9.0 miles / 14.5 kilometers | NW | 16.1 mph / 25.9 km/h | 20.7 mph / 33.3 km/h | 0.01 in / 0.0 cm | Rain | Light Rain |
| 12:43 PM | 37.4 °F / 3.0 °C | 35.6 °F / 2.0 °C | 93% | 29.47 in / 997.9 hPa | 9.0 miles / 14.5 kilometers | NW | 15.0 mph / 24.1 km/h | - | 0.01 in / 0.0 cm | Rain | Light Rain |
| 12:54 PM | 37.9 °F / 3.3 °C | 36.0 °F / 2.2 °C | 93% | 29.47 in / 997.8 hPa | 9.0 miles / 14.5 kilometers | West | 13.8 mph / 22.2 km/h | - | 0.01 in / 0.0 cm | Rain | Light Rain |
| 1:01 PM | 37.4 °F / 3.0 °C | 35.6 °F / 2.0 °C | 93% | 29.47 in / 997.9 hPa | 10.0 miles / 16.1 kilometers | WNW | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | Rain | Light Rain |
| 1:16 PM | 37.4 °F / 3.0 °C | 35.6 °F / 2.0 °C | 93% | 29.47 in / 997.9 hPa | 10.0 miles / 16.1 kilometers | NW | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | | Overcast |
| 1:54 PM | 37.0 °F / 2.8 °C | 36.0 °F / 2.2 °C | 96% | 29.48 in / 998.1 hPa | 10.0 miles / 16.1 kilometers | West | 15.0 mph / 24.1 km/h | - | 0.00 in / 0.0 cm | Rain | Light Rain |
| 2:54 PM | 39.0 °F / 3.9 °C | 35.1 °F / 1.7 °C | 86% | 29.49 in / 998.7 hPa | 10.0 miles / 16.1 kilometers | WNW | 17.3 mph / 27.8 km/h | 23.0 mph / 37.0 km/h | 0.00 in / 0.0 cm | Rain | Light Rain |
| 3:54 PM | 39.9 °F / 4.4 °C | 36.0 °F / 2.2 °C | 86% | 29.52 in / 999.4 hPa | 10.0 miles / 16.1 kilometers | WNW | 18.4 mph / 29.6 km/h | 21.9 mph / 35.2 km/h | 0.00 in / 0.0 cm | | Overcast |
| 4:54 PM | 41.0 °F / 5.0 °C | 36.0 °F / 2.2 °C | 82% | 29.54 in / 1000.1 hPa | 10.0 miles / 16.1 kilometers | West | 12.7 mph / 20.4 km/h | - | 0.00 in / 0.0 cm | | Mostly Cloudy |
| 5:54 PM | 41.0 °F / 5.0 °C | 32.0 °F / 0.0 °C | 70% | 29.57 in / 1001.2 hPa | 10.0 miles / 16.1 kilometers | WNW | 16.1 mph / 25.9 km/h | 21.9 mph / 35.2 km/h | N/A | | Overcast |
| 6:54 PM | 39.9 °F / 4.4 °C | 30.0 °F / -1.1 °C | 68% | 29.60 in / 1002.4 hPa | 10.0 miles / 16.1 kilometers | WNW | 13.8 mph / 22.2 km/h | | N/A | | Scattered Clouds |
| 7:54 PM | 39.0 °F / 3.9 °C | 30.9 °F / -0.6 °C | 73% | 29.64 in / 1003.7 hPa | 10.0 miles / 16.1 kilometers | West | 12.7 mph / 20.4 km/h | | N/A | | Clear |
| 8:54 PM | 39.0 °F / 3.9 °C | 30.0 °F / -1.1 °C | 70% | 29.68 in / 1004.9 hPa | 10.0 miles / 16.1 kilometers | West | 17.3 mph / 27.8 km/h | | N/A | | Mostly Cloudy |
| 9:54 PM | 37.9 °F / 3.3 °C | 30.9 °F / -0.6 °C | 76% | 29.71 in / 1005.9 hPa | 10.0 miles / 16.1 kilometers | West | 13.8 mph / 22.2 km/h | | N/A | | Mostly Cloudy |
| 10:54 PM | 37.9 °F / 3.3 °C | 30.0 °F / -1.1 °C | 73% | 29.73 in / 1006.7 hPa | 10.0 miles / 16.1 kilometers | WNW | 13.8 mph / 22.2 km/h | 19.6 mph / 31.5 km/h | N/A | | Overcast |

11:54
PM

37.9 °F / 3.3 °
C

28.9
°F / -
1.7 °C

70%

29.74 in /
1007.1 hPa

10.0 miles /
16.1 kilometers

West

15.0 mph /
24.1 km/h

-

N/A

**Partly
Cloudy**



| Astronomy | | | |
|---|---|---|---|
| Sunrise: | 07:05 AM (EDT) | Moon Rise: | 04:28 AM (EDT) 10/23 |
| Sunset: | 05:50 PM (EDT) | Moon Set: | 05:09 PM (EDT) 10/23 |

Moon Phase

more...

**Oct. 23** Oct. 25 Oct. 31 Nov. 08 Nov. 16

 Copyright © 2005 The Weather Underground, Inc.



(e) This is a close up of the locomotive doorway leading to the front of the locomotive as in (d).

FortuneCity ®®    web hosting    domain names    photo sharing

**Health Insurance Quotes Instantly!!**

Web Hosting - $7.45     Online Photo Album     Domain Names
Web Hosting     Are You Overweight?     Online Games

Photo by Paul Apollo



(d) This photo (B&M 337) shows the design of the GP-40 locomotive
commonly in use on most major railroads...note the door leading to the front
deck from the Trainmans side of the locomotive.



(c)  This photo is a close up of the door on the nose of a sister locomotive.

FortuneCity

web hosting    domain names    web hosting

**Interested in Working At Home?**

Web Hosting - $7.45    Online Photo Album    Domain Names Web Hosting    Are You Overweight?    Online Games



(b) This photo of a sister GP-40-2 shows an employee entering the locomotive from the nose, the same type door involved in the accident.



(a) This is the Locomotive(GP-40-2) MEC 515, that Plantiff, Sawyer was injured on during during his assignment. The door that slammed on his hand is visable ,partly open.

C

PUBLIC LAW BOARD NO. 4623

Case No.   130
Award No. 130

PARTIES TO DISPUTE:

UNITED TRANSPORTATION UNION

-and-

SPRINGFIELD TERMINAL RAILWAY COMPANY

STATEMENT OF CLAIM:

Appeal of Conductor Robert J. Sawyer for removal of the discipline assessed him on December 13, 2002 (14-day suspension) and pay for all time lost.

FINDINGS:

This Board, upon the whole record and all the evidence, finds as follows:

That the parties were given due notice of the hearing;

That the Carrier and Employees involved in this dispute are respectively Carrier and Employees within the meaning of the Railway Labor Act as approved June 21, 1934;

That this Board has jurisdiction over the dispute involved herein.

On October 3, 2003 Claimant was the Conductor on Train BO-1 in Boston. At around 1:20 p.m., the Claimant exited the engine through a door in the nose. He was going to throw a switch for the train's movement. The engine was not moving at the time.

After the Claimant opened the door to exit the locomotive the door suddenly closed striking his right hand. The Claimant was unable to explain why or how the door closed. No one witnessed the accident. There was no one outside the engine at the time of this mishap. The door is a heavy door that swings out from the engine to the left. After the door is opened there is no device, such as a latch, to keep it open.

The Claimant was transported to Massachusetts General Hospital in Boston where part of his ring finger on his right hand was amputated. He was out of work because of the injury.

The Claimant was notified to attend a hearing to determine his responsibility, if any, for failing to properly perform his duties while employed as the Conductor on assignment BO-1 on October 23, 2003, when he injured his right hand while getting off engine number MEC 515. The investigation was held on November 19, 2003. On December 3, 2003, Claimant was advised that the charge was upheld and he was being assessed a 14-day suspension (December 1 through and including December 14, 2003).

The Carrier contends that the Claimant incurred a personal injury on October 23, 2003 because he violated Safety Rule #79. Safety Rule 79 provides that:

> *Care must be exercised in opening and closing locomotive, and car doors to avoid injury to fingers being caught against door facings and latches. Handles provided for that purpose must be used. Do not place fingers or hands on edge of door or doorjamb for any reason.*

The evidence presented at the November 19, 2003, investigation fails to convince this Board that the Claimant violated Safety Rule 79 while leaving the engine on October 23, 2003. There is no evidence in the record that he did not use the handle on the engine door to open it. Nor is there any evidence that he placed his fingers or hand on the edge of the door or the doorjamb after he opened it. Moreover, he was wearing gloves when the accident occurred. The Carrier acknowledged that the door the Claimant used was the normal way to exit the engine.

The Carrier maintains that the Claimant caused the door to close on his hand since there was no one else near the door when it closed and no outside force caused it to close. This is mere conjecture on the Carrier's part. As observed above, no one witnessed the door close and the Claimant did not know why or how it closed.

There is not a scintilla of evidence that the Claimant did anything to cause the door to close on his hand. He used the handle on the door to open it, as Rule 79 requires. Because there was no device to secure the door it inexplicably closed causing a serious injury to the Claimant's finger. Since the accident happened so suddenly there was nothing the Claimant could have done to prevent it, in our view.

Inasmuch as the evidence fails to demonstrate that the Claimant improperly performed his duties as the Conductor of assignment BO-1 on October 23, 2003, when an engine door he was exiting suddenly closed injuring a finger on his right hand, the discipline assessed him on December 3, 2003, was unjustified. That discipline must be removed from the Claimant's record and he must be made whole for all lost wages.



Case 1:04-cv-11945-JLT    Document 24-2    Filed 08/31/2005    Page 25 of 30

TRANSPORTATION DEPARTMENT
HEARING TRANSCRIPT

(Sawyer Personal Injury)
Held on November 19, 2003

Page 25

| | |
|---|---|
| Mr. Gorreck: | No. |
| Mr. M. Maloof: | Okay that's all I have to know, all right. Now – |
| Hearing Officer: | I'm going to flip the tape now. |
| Mr. M. Maloof: | Go ahead. (off record to flip tape over) |

**Tape 1 flip over to Side B**

| | |
|---|---|
| Hearing Officer: | We are back on record at 0935 hours after a tape change. Mr. Maloof, you can continue your questions. |
| Mr. M. Maloof: | Now I know you said you did not observe the trucks of the locomotive, did you by chance observe the wheels themselves? |
| Mr. Gorreck: | No, no we did not. |
| Mr. M. Maloof: | So you don't know whether or not any particular wheel in the set of trucks was a little bit lower than another wheel sitting in a joint or anything like that on the rail? |
| Mr. Gorreck: | Yeah, we didn't know. |
| Mr. M. Maloof: | Okay. Now I believe you stated in your direct testimony that the door itself where the injury occurred does not have a closer, an automatic closer? |
| Mr. Gorreck: | No it doesn't. |
| Mr. M. Maloof: | Do you know if the door is safety valve so that the door won't slam shut on you? Does it have a safety valve to prevent it from just slamming shut? |
| Mr. Gorreck: | No it doesn't. |
| Mr. M. Maloof: | Okay and am I correct when I state that that door is located in the front of the engine on the nose of the locomotive? |
| Mr. Gorreck: | Yes. |

| | |
|---|---|
| Mr. M. Maloof: | And it opens outwards to the wind if it was in motion? |
| Mr. Gorreck: | That's possible yes. |
| Mr. M. Maloof: | Okay and it's designed that way. Why is it designed that way, do you know? |
| Mr. Gorreck: | I don't know why they are designed to open out. |
| Mr. M. Maloof: | Could it be to keep it closed when it's in motion, the pressure of it? |
| Mr. Gorreck: | More than likely yes. |
| Mr. M. Maloof: | Now exactly or where you able to determine how much force is required to give motion to that door when the locomotive is stopped? |
| Mr. Gorreck: | Just normal average, you don't have to overstrain yourself to close one of them doors. |
| Mr. M. Maloof: | Well would it move if you put your finger up against it and pushed it? |
| Mr. Gorreck: | Maybe a little bit but – |
| Mr. M. Maloof: | How about two fingers if you pushed it? |
| Mr. Gorreck: | Two fingers? You'd need a little bit of force to close one of them doors or push it. |
| Mr. M. Maloof: | Okay let me ask you this. If the locomotive was still and the door was open, could the force of the wind make the door close? |
| Mr. Gorreck: | It's possible but it would have to be a very strong wind. |
| Mr. M. Maloof: | Okay now did you make any measurement as to the force required to actually move that door when you were there that day? |
| Mr. Gorreck: | No. |

E

# RÉSUMÉ OF LEWIS N. CATONE

 **SUMMARY OF QUALIFICATIONS**

Investigative consultant/expert witness providing research, analysis, reconstruction, recommendations and testimony in litigation involving rail safety and federal regulatory compliance. Disability retirement – Metro North Commuter Railroad - 1989.

Over 40 years of railroad management experience in direct supervision of hundreds of trains daily over thousands of miles. Superior expertise in passenger train movements. Direct supervision over thousands of employees and millions of budget dollars.

Absolute and total familiarity with Federal Regulations, railroad operating and safety rules of all respective crafts and departments.

Absolute and total familiarity with all phases of railroad accident investigations, working with the National Transportation Safety Board, the Federal Railroad Administration and local law enforcement agencies.

Astute experience in the safe coordination of train movement in conjunction with work performed by non-operating crafts. Primary emphasis throughout career enforcing and preserving the safety of all railroad employees and civilians under my jurisdiction.

**DETAILED PROFESSIONAL EXPERIENCE**

➤ **METRO-NORTH COMMUTER RAILROAD – 01/83 to 11/89**

TRAINMASTER-CAPITAL PROJECTS; TERMINAL MANAGER;TERMINAL SUPERINTENDENT/GRAND CENTRAL TERMINAL

Responsible for providing rail transportation support to Capital Projects – (construction) scheduling track time to permit maximum production by the contractor(s) without impacting upon passenger service; coordinate work with other contractors and railroad maintenance forces to maximize production for all parties without disrupting service and permit the contractors to work effectively with the railroad in a safe working environment.

Managed all Grand Central related passenger functions including building service, train information, tenant needs regarding terminal operation controls, support, train and engine forces. Made significant improvements within the complex. Responsible for track assignments and yard related functions.

- ***THIRTY-ONE YEARS WITH PREDECESSOR RAILROADS – CONRAIL, PENN CENTRAL AND NEW YORK CENTRAL***

➤ **CONRAIL – 04/76 to 01/83**

DIRECTOR PASSENGER TERMINAL OPERATIONS; SPECIAL ASSIGNMENT FOR GENERAL MANAGER;

Managed all station personnel and functions on the Metropolitan Region of Conrail, including Central Terminal Complex. Re-developed efficiency of railroad's passenger services.

Worked throughout 1982 as the Metropolitan Transit Authority's representative in implementing the Rail Reorganization Act by acquiring locomotives, rolling stock and track and mechanical department equipment, facilities, property and trackage rights. Removed all AMTRAK functions including personnel from the commuter operation and established

1




accounting formulas between the MTA and Amtrak/Conrail.

Worked on confidential projects for General Manager investigated accounting procedures, payroll matters involving train and engine personnel. Created car control methods on the Metropolitan Region and reduced car hire costs. Instrumental in negotiating contract between the MTA and Conrail to reduce MTA's car hire costs. Maintained control of work train production and locomotive/equipment utilization reducing daily renting of locomotives. Established a system for servicing commuter rolling stock independent of Conrail. Established program to increase Maintenance of Way production on the region.

➤ **PENN CENTRAL RAILROAD – 01/68 to 04/76**

<u>TRAINMASTER; MANAGER PASSENGER TERMINAL OPERATIONS; SUBURBAN PLANNING ENGINEER</u>

Supervised the Oak Point Terminal Complex, including the Food Center a Hunts Point Terminal, the interchange of crs with the Long Island Railroad. Instituted new method of car control to increase yard efficiency and assumed operation of the Bay Ridge Branch.

Consolidated all stations on the former New Haven and New York Central into Metropolitan Passenger Region. Implemented efficiency of all passenger station functions including accounting and related procedures. Rehabilitated Ticket Offices, fares, services. Established separation with AMTRAK. Mechanized ticket offices and incorporated the New Haven into "Chek It". Established budgets and related cost control activities.

Implemented new schedules on the New Haven Line for the implementation of zone scheduling. Created new track assignments, train consists, equipment and power utilization and new crew assignments. Helped create new time table schedule with new fares for MTA/CTA's contract(s).

➤ **NEW YORK CENTRAL RAILROAD – 03/48 to 01/68**

<u>SUPERVISOR OF STATIONS; TRANSPORTATION ASSISTANT</u>

Staff Supervisor in the General Manager's office of the New York District. Responsible for staff supervision of 4,500 station employees in Mail, Freight, Ticket and all Literage work with the New York Harbor and north to Albany. Coordinated import/export traffic within the harbor. Implemented the centralized demurrage and industrial car control system and the centralized "WHIP" system; managed the demurrage bureau and streamlined the railroad's operation within the harbor and district. Supervised the Flexi-Van/Piggy Back and Auto site operation. Instrumental in forming the first Rail to Container operation with SeaTrain for its Puerto Rico service.

Staff Supervision in the District Transportation office. Made and supervised car groupings and classifications, engine and crew assignments. Coordinated and scheduled all Maintenance of Way and construction work on the district to permit on-time performance of symbol freights and passenger trains; and at the same time protecting the safety of the workers against train movement. Direct supervision over all train dispatchers to schedule trains and coordinate respective train crews with the system. Programmed use of yard engines to handle through trains to and from the district. Programmed lighters and tugs to and from ships and float bridges/contract terminals.



<u>NEW YORK CENTRAL RAILROAD</u>

Train Dispatcher

Freight and Ticket Clerk

2

Block Operator/Leverman

Baggageman (Station Training) Participated in numerous studies to consolidate yards and terminals.

 **UNION EXPERIENCE**

## EXECUTIVE OFFICER AMERICAN TRAIN DISPATCHERS' ASSOCIATION – 1974-81

Granted leave of absence from the railroad to serve elected union official position of General Chairman of the New York Central Committee, representing Train Dispatchers on the former New York Central Railroad between New York and Chicago, including the Pennsylvania Railroad office at Indianapolis, Indiana and the Erie Lackawanna office at Elizabethport, New Jersey. Negotiated collective bargaining agreements and contracts for constituent membership with Conrail. Worked on various labor committees and with commuter groups. Contributed in creating the New York State Inspector General's position to oversee the commuter rail operation.

**PROFESSIONAL ACTIVITIES AND COMMITTEES**

Former Representative for Northeast Rail Labor Committee

Former Member Railway Superintendents' Association

Served on Congressman Richard Ottinger's Transportation Committee

Served on NYS Assemblyman Peter Sullivan's Transportation Committee

Served on Harlem Valley Commuters Council

Past Commander – American Legion

Present Treasurer – American Legion

Member Disabled American Veterans

Past President Neighborhood Association

 **MILITARY EXPERIENCE**   1950-1954 U. S. Air Force Airborne Radio Operator (A/C)

Honorable Discharge.

 **REFERENCES**   Available upon request